CLARENCE EMERSON, APPELLANT, v. CITIZENS STATE BANK OF THEDFORD ET AL., APPELLEES.

FILED DECEMBER 8, 1933. No. 28621.

*Harry R. Ankeny,* for appellant.

*Sullivan & Wilson, Field, Ricketts & Ricketts, Clark Jeary* and *Donald Day, contra.*

Heard before GOOD, EBERLY and DAY, JJ., and CHAPPELL and LANDIS, District Judges.

GOOD, J.

This is an action to rescind a contract for purchase of land by plaintiff from defendant Citizens State Bank of Thedford, to recover money paid on the contract, cancel promissory notes given in part payment therefor, and, in the alternative, for a judgment in damages resulting from fraudulent conspiracy of all the defendants. Defendants denied any fraud or conspiracy. The trial of the issues resulted in a general finding and judgment for defendants. Plaintiff has appealed.

The record reflects the following pertinent facts: Plaintiff and defendant Munger are physicians and surgeons residing in the city of Lincoln, Nebraska, with adjoining offices in the same building. For many years they have been friendly in a professional way, each assisting the other in many surgical operations. For a number of years before this controversy arose, defendant Munger was the owner of a cattle ranch in Thomas county, Nebraska, which apparently had proved very profitable to him. Plaintiff had, from time to time, visited Munger's ranch with Munger, and in 1929 he purchased a ranch in the same vicinity. Munger and plaintiff had discussed the question of a joint enterprise in cattle ranching. In the summer of 1929 plaintiff had asked Munger to be on the lookout for additional ranch lands in the vicinity of their ranches that could be purchased at a reasonable price.

In July of 1929 plaintiff took a vacation trip to Alaska and was gone for some weeks. Some time during the month of July Munger desired to purchase an 80-acre tract of land, adjoining his ranch, on which to erect a

water-tank. He learned that this 80-acre tract was owned by the Citizens State Bank of Thedford. He went to the bank to see if he could purchase this tract. Defendant McMillan, cashier of the bank, informed Munger that the bank owned the 80 acres, but did not desire to sell it separately from a larger tract which the bank had acquired in foreclosure proceedings, but that it wished to sell the entire tract, comprising 1,120 acres. This tract of land also lay adjacent or in close proximity to the ranch which plaintiff had previously purchased. Munger informed McMillan that he did not desire to purchase the entire tract, but he thought he knew of a person who would be interested in it, if it could be bought at a reasonable price. McMillan informed him that the bank would sell the entire tract for $9 an acre. Munger then inquired what commission the bank would pay if he found a purchaser. It was finally agreed that if Munger found a purchaser at $9 an acre for 1,040 acres of the land the bank would convey to him the 80-acre tract which he desired and pay him $1,040 as commission, or, in other words, all in excess of $8 an acre for the 1,040 acres.

Upon plaintiff's return from Alaska, Munger informed him of the opportunity to purchase this land, 1,040 acres, at $9 an acre, and, in effect, said that it was a bargain at that price, but did not disclose the fact that, if plaintiff purchased the land, Munger would receive a commission. In September plaintiff and Munger visited Thomas county, went to the bank, where plaintiff was introduced to McMillan; the latter showed plaintiff the amount for which the land was carried on the books of the bank, and informed him of the price, $9 an acre. Plaintiff asked to be shown the land. The cashier, not being able to leave the bank at that time, directed plaintiff and Munger to go to certain individuals who would show them the land. Plaintiff and Munger followed directions and went to a point either on or very close to the land and were shown the ranch land. At this point, plaintiff testifies, certain fences were pointed out to him and he was told

that all the land lying south and west of this fence was a part of the tract; that a part of this land so shown was fine bottom land and part of it was not, in fact, a part of the 1,040-acre ranch. It may be said on this question that the other witnesses who were there flatly contradict the plaintiff in this and say that they were on the edge of the land in question and pointed out the true boundaries thereof.

Plaintiff and Munger both returned to Lincoln; plaintiff started a correspondence with the bank, and quite a number of letters were exchanged, plaintiff attempting to induce the bank to take a less sum than $9 an acre for the 1,040 acres. Apparently, he conferred from time to time with defendant Munger, and informed him of his efforts to induce the bank to take a less sum. It also appears that on two or three occasions, between that time and the time the contract was finally signed, plaintiff visited Thomas county and the land in question, and his letters indicate that he had offers of other land in the vicinity and dickered with the bank to reduce its price. Finally, the bank consented to take $9,000 for the 1,040 acres. Some time elapsed before they reached an agreement as to time of payments and interest rate on deferred payments. It was finally agreed that plaintiff would purchase the land at $9,000, paying $2,000 in cash and giving promissory notes for the balance. The bank then conveyed to Munger the 80-acre tract above mentioned and gave him credit for $640, being all in excess of $8 an acre for the purchase price. Plaintiff took possession of the ranch, rented it out and has been in possession, receiving the rents and profits thereof, ever since, and until the time of the trial. He did not learn that his friend Munger had received a commission on the sale of the land until about the 1st of September, 1930. He commenced this action on the 17th day of December, 1930.

After plaintiff had discovered and had knowledge of the alleged fraud and conspiracy, he discussed with the president of the bank the question of discounting his notes,

and indicated that he was not, at that time, able to discount his notes, but would pay them as they became due. The evidence also shows that at the time plaintiff was bargaining for the land the price of grass-fed cattle ranged from $8 to $11 per cwt.; that shortly subsequent thereto the price declined very materially, and that ranching became less profitable; in fact, from being a very profitable business, it had become unprofitable. It also appears in the record that plaintiff had looked at and had contemplated buying another ranch previous to the time of negotiating for the one in controversy, which also lay adjacent or in close proximity to the ranch he at first purchased, but that he decided not to buy the land, and that defendant Munger did buy it after plaintiff concluded not to purchase; that plaintiff, in conversations with Munger, expressed regret that he had not purchased that ranch, and thought he had made a mistake in not so doing. It also appears that defendant Munger, probably because of the great decline in the price of grass-fed cattle, was unable to pay for that ranch and subsequently lost it. It appears from the record that neither the bank nor its officers knew of any close friendship between plaintiff and defendant Munger, or had any knowledge as to whether or not plaintiff knew that Munger was to receive a commission if the sale to plaintiff was effected. Plaintiff testified that defendant Munger told him that he had no interest in the sale and that his only desire was that plaintiff might purchase the ranch so that they could engage in the cattle ranching business together. This is flatly contradicted by Munger.

Many witnesses testified as to the actual value of the land contracted for by plaintiff. Testimony offered on behalf of plaintiff tended to show that the land was worth from $4 to $5.50 an acre; that on behalf of defendants tended to prove that it was worth from $8 to $10 or $11 an acre.

Three questions of fact are presented by the record: (1) Is there evidence that would establish conspiracy as

contended by plaintiff? (2) Were misrepresentations made as to the actual boundaries of the land? (3) Was plaintiff overreached and induced to purchase the land at a price in excess of its then value?

In our opinion, the record is absolutely barren of any evidence that would establish a conspiracy between the bank and its officers, on the one hand, and Munger on the other. There is no evidence that there was any agreement that Munger's agency for the sale of the land should not be disclosed. There is no evidence that any officer of the bank had any knowledge or information of anything approaching a confidential relationship between plaintiff and Munger. The charge of conspiracy is not sustained.

The evidence relating to the misrepresentation as to the actual boundaries of the tract is in conflict. Plaintiff alone testified to the misrepresentation; while at least two other witnesses testified that he was shown the exact boundaries, and that there was no misrepresentation as to the actual boundaries. Plaintiff testified that a fence, running diagonally from northwest to southeast, was pointed out to him as the boundary line. He knew that the description of the land followed governmental subdivisions and must have known that the boundary line could not thus run diagonally. In our view, the evidence upon this point preponderates in favor of defendants. The charge of misrepresentation as to the actual boundaries of the land is not sustained.

On the question of value, a number of plaintiff's witnesses did not reside in the vicinity nor in the county, but were persons engaged in appraising land for loan purposes for insurance companies or other lending agencies. The witnesses for defendants were more numerous and for the most part resided in the immediate vicinity; owned land adjacent or in close proximity to the land involved in this controversy, and were in a better position to know the value of land than were the witnesses for the plaintiff. We are constrained to hold that the evidence shows that the value of the land, at the time plain-

tiff agreed to purchase it, was as great as the amount plaintiff agreed to pay for it. It is a matter of common knowledge that, since the fall of 1929, there has been a rapid, continual decline in the prices of farm products, and particularly of live stock, and in land values. At the time plaintiff bargained for the land the raising of cattle on ranches was exceedingly profitable. Because of the conditions that have prevailed generally in this part of the country for the past four years, that industry has become unprofitable, and that fact has, perhaps, induced plaintiff to believe that he was defrauded in the purchase of land. In this connection it may be observed that the conduct of defendant Munger, in failing to disclose his agency for the sale of the land to the plaintiff, is not to be commended. This is an action in equity, and the record presents no question calling for equitable relief. Whether plaintiff might have a right of action against defendant Munger for damages is not properly before us and is not determined.

We find no ground for interfering with the judgment of the district court.

AFFIRMED.