JOHN F. TREBELHORN, APPELLEE, V. RAY L. BARTLETT ET AL., APPELLANTS.

47 N. W. 2d 374

Filed March 30, 1951. No. 32903.

*Lloyd E. Chapman* and *Charles W. Phillips,* for appellants.

*Ginsburg & Ginsburg,* for appellee.

Heard before SIMMONS, C. J., CARTER, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff brought this action to recover damages from defendants, who allegedly conspired together for the purpose of fraudulently inducing him, and by false and fraudulent representations of each did so induce him to sell his stock in defendant Ace Plumbing & Heating Company, a corporation, for less than its actual value.

Upon issues joined and trial to a jury, it returned a verdict for plaintiff in the amount of $4,000, and judgment was entered thereon. The trial court overruled defendants' motion for judgment notwithstanding the verdict or in the alternative for a new trial, and they appealed, assigning: (1) That the verdict and judgment were not supported by the evidence but contrary thereto; (2) that the court erred in exclusion of certain evidence; (3) erred in the giving and refusal of instructions; and (4) erred in refusing to declare a mistrial because prejudicial questions were asked by counsel for plaintiff upon voir dire. We conclude that the assignments should not be sustained.

Defendants cited no authority to sustain the fourth

or last assignment. In that connection, it is generally the rule that: "Upon the voir dire examination of a proposed juror, each party has the right, within reasonable limits, to put pertinent questions for the purpose of ascertaining whether there exists sufficient grounds for a challenge for cause, and also to aid the party in the exercise of his statutory right of peremptory challenge.

"The extent to which such examination may be carried rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed unless there has been an abuse of discretion to the prejudice of the complaining party." Strong v. State, 106 Neb. 339, 183 N. W. 559. In the light of such rules, we have examined the record, and conclude that the assignment has no merit.

We turn then to the first assignment, decision of which depends upon rules of law applicable to competent evidence appearing in the record.

A conspiracy, like other facts, may be proved by direct or circumstantial evidence, and one means of proof is by showing overt acts or representations of the individuals charged with conspiracy. From the fact that different persons at different times by their acts or representations pursued the same object, the jury may, in connection with other facts, infer the existence of a conspiracy to effect that object. Patton v. Rapp, 133 Neb. 308, 275 N. W. 315.

In an action for damages based upon a conspiracy to defraud, such as that at bar, the damages and not the unlawful confederation is the gist of the action, so that if damages are shown to have resulted to plaintiff from wrongful acts or misrepresentations of defendants or any of them, then a judgment against such defendants may be sustained without establishing a conspiracy among them all. Dunbier v. Mengedoht, 119 Neb. 706, 230 N. W. 669; Harvey v. Harvey, 75 Neb. 557, 106 N. W. 660; Commercial Union Assurance Co. v. Shoemaker,

63 Neb. 173, 88 N. W. 156; Booker v. Puyear, 27 Neb. 346, 43 N. W. 133.

As stated in Annotation, 152 A. L. R. 1147: "It has been frequently pointed out that, speaking broadly, there is no such thing as a civil action for conspiracy, the action being for damages caused by acts committed pursuant to a formed conspiracy, rather than the conspiracy itself, so that, unless something is actually done by one or more of the conspirators which results in damage, no civil action will lie against anyone. See, for example, 11 Am Jur 577, Conspiracy, § 45. Thus, in most cases the gist of such an action is the wrongful conduct resulting in the plaintiff's damage, and proof of a conspiracy is of no consequence except as bearing upon the rules of evidence, * * * or to bring within the ambit of liability someone who may have conspired but who did not actively participate in the conduct itself. In such cases failure to prove an allegation of conspiracy does not affect the plaintiff's right to recover, there being sufficient independent grounds for recovery, although it limits those against whom recovery may be had to persons actively participating in the conduct complained of, and whose acts, as regards time, substance, and result, in fact united to produce the injury."

The case at bar is such a case wherein the cause of action was one independent of conspiracy and not one dependent thereon as distinguished in Annotation, 152 A. L. R. 1154. Reid v. Brechet, 117 Neb. 411, 220 N. W. 590, relied upon by defendants, is clearly distinguishable upon the pleadings and the facts.

Fraud may consist in words, acts, or the suppression of material facts with the intent to mislead or deceive. Faulkner v. Klamp, 16 Neb. 174, 20 N. W. 220; 37 C. J. S., Fraud, § 9, p. 225, § 15, p. 242; 23 Am. Jur., Fraud and Deceit, § 24, p. 776, § 76, p. 850; Restatement, Contracts, § 470, p. 890, § 471, p. 891.

As stated in Restatement, Contracts, § 479, p. 915, approved in George v. Guarantee Mutual Life Co., 144

Neb. 285, 13 N. W. 2d 176: " 'Where fraud or misrepresentation is material with reference to a transaction subsequently entered into by a person deceived thereby, it is assumed in the absence of facts showing the contrary that it was induced by the fraud or misrepresentation.' "

Also, as stated in 37 C. J. S., Fraud, § 22, p. 259: "It is generally held that a fraudulent intent or the equivalent thereof is an essential element of fraud, and that such intent may be established by appropriate inference or presumption from the facts proved." ·

In Falkner v. Sacks Bros., 149 Neb. 121, 30 N. W. 2d 572, this court held: "To maintain an action for damages for false representation the plaintiff must allege and prove what representation was made; that it was false and so known to be by the defendant charged with making it, or else was made without knowledge as a positive statement of known fact; that the plaintiff believed the representation to be true; and that he relied and acted upon it, and was thereby injured.

"A person is justified in relying upon a representation made to him in all cases where the representation is a positive statement of fact, and where an investigation would be required to discover the truth.

"The general rule that fraud is not presumed, but must be proved by the party who alleges it, does not mean that it cannot be otherwise proved than by direct and positive evidence. Fraud in a transaction may be proved by inferences which may reasonably be drawn from intrinsic evidence respecting the transaction itself, such as inadequacy of consideration, or extrinsic circumstances surrounding the transaction."

In Vavricka v. Mid-Continent Co., 143 Neb. 94, 8 N. W. 2d 674, a case involving the purchase and sale of corporate stock, this court held: "While actionable fraud may not be predicated upon sales talk, puffing, or the expression of a mere opinion as to value honestly made under circumstances that do not give another the right

to rely thereon, representations of positive facts pertaining to the quality of the thing sold and relied upon by the purchaser, which are calculated to mislead and deceive, if proved false, constitute actionable fraud."

The measure of damages recoverable by one who has been induced to sell corporate stock by fraud of the parties acquiring it is the difference between the consideration received by the seller and the actual value of such stock at the time of the transaction if the latter exceeds the former. 24 Am. Jur., Fraud and Deceit, § 235, p. 66; Rothery v. Pounds, 150 Neb. 25, 33 N. W. 2d 347; Annotation, 57 A. L. R. 1153; Annotation, 108 A. L. R. 1066; Helming v. Kashak, 122 Conn. 641, 191 A. 525; McDonough v. Williams, 77 Ark. 261, 92 S. W. 783, 8 L. R. A. N. S. 452..

The actual value of corporate stock which has no market value, that is, where it is all common stock closely held and not listed or actively traded in on any stock exchange, as in the case at bar, is ordinarily determinable from the then net worth of the corporation divided by the number of bona fide shares issued and outstanding. For that purpose, evidence of the factors and elements, such as assets, liabilities, and all other matters pertinent to the value of the particular corporation involved, may be admitted and considered. Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393; Zinn v. Ex-Cell-O Corp., 24 Cal. 2d 290, 149 P. 2d 177; Culbreath v. Investors Syndicate, 203 S. C. 213, 26 S. E. 2d 809, 147 A. L. R. 1144; Humphrey v. Baron, 223 Iowa 735, 273 N. W. 856; 31 C. J. S., Evidence, § 183, p. 901; 22 C. J., Evidence, § 146, p. 186.

Finally, it is elementary that a motion for a directed verdict or for judgment notwithstanding the verdict must, for the purpose of decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, who is entitled to have every controverted fact resolved in his favor and have the

benefit of every inference that can reasonably be deduced from the evidence. Pahl v. Sprague, 152 Neb. 681, 42 N. W. 2d 367.

In the light of the foregoing rules, we have examined the voluminous record. Of necessity we can only summarize the material competent evidence adduced in plaintiff's behalf from which a jury could have reasonably concluded as follows: Prior to September 1947, plaintiff had conducted a small furnace and sheet metal business from his home. He had only a limited education and was without knowledge or experience in bookkeeping, business management, or corporate affairs. Defendants Bartlett and Schumacher, a partnership under the name of Bartlett and Company, had been engaged for some time in the real estate business in Lincoln. Defendant Martin had been a journeyman plumber, working for one of the large plumbing concerns in Lincoln.

After the parties had become acquainted and after preliminary meetings, it was agreed between them to form an association for the general purpose of selling and installing plumbing and heating supplies, material, and equipment. The holding of such meetings was originally fostered by Bartlett, who purportedly had sufficient money to successfully launch a business, together with leads and influence whereby material could be obtained, and who needed a reliable plumber and furnace man to complete his projects then at hand.

The form of the business organization determined upon was a corporation to be known as "Ace Plumbing & Heating Co." with an authorized capital of $15,000, divided into 150 shares of common stock only, each having a par value of $100. A minimum of $5,000 capital was agreed to be paid in before commencement of business. In that regard it was agreed that Bartlett and Schumacher would each invest $1,500 cash in stock, while Martin and plaintiff were each to so invest $1,000, represented by cash, equipment, and supplies, making

a total of 50 shares issued and outstanding. It was further agreed that plaintiff and Martin would each have opportunity, when financially able, to acquire an additional amount of stock, and that no further stock would be issued to any of the parties until all had acquired an equal amount. It was also agreed that monthly reports would be furnished showing the financial condition of the corporation.

In that situation the corporation commenced business on October 1, 1947, with Martin as president and manager, Bartlett as treasurer, Schumacher as secretary, and plaintiff as vice president. It was understood, however, that plaintiff would not have any duties or responsibility with reference to bookkeeping or management, and that all checks would be signed and all financial matters of the corporation would be performed by Bartlett and Schumacher. The office of the corporation was a short time thereafter moved from Bartlett and Company offices to a room in a building on North 11th Street owned by or under their management, for the use of which the corporation paid them $150 a month rental. Martin and plaintiff were employed by the corporation at an hourly rate.

The business of the corporation speedily expanded in volume, a large part of which was done by the corporation in furnishing labor and materials for heating and plumbing installations in remodeling a Bartlett and Schumacher apartment building. The corporation also acquired a substantial inventory of equipment, merchandise, and supplies, in the sale of which it was stipulated that the corporation charged its customers a profit of 30 percent, with an additional 20 percent for overhead. It was also stipulated that it charged an overwrite of 50 cents an hour on all labor supplied, except plumbers, for which it charged an overwrite of 62½ cents an hour. The corporation at times had as many as 27 employees.

During the period from October 1, 1947, to January

1, 1949, plaintiff from time to time made requests of the several defendants for financial reports·and information relating to progress of the corporation's affairs. Upon such occasions, Bartlett told plaintiff: " 'I don't know why you want a financial report because we have not got any surplus, we have not made any money, if hadn't been for me loaning the Company money we would have been closed a long time ago'. * * * What do you want a report for? We have made no money." When Martin was asked for a report, he said: "That there wasn't one, didn't have one ready, and so forth, yet." In that situation, plaintiff never was furnished or saw any of the reports, audits, financial statements, bank records, or other memoranda relating to the financial situation of the company.

On or about January 4, 1949, without previous warning, Martin told plaintiff: " 'You are fired'. * * * 'You are not working for the Ace Plumbing Company no more'. * * * 'the stockholders agreed you are not working here any more' * * * 'the stockholders say you are fired'. * * * 'Too many squawks.' " Plaintiff immediately sought an explanation from the other defendants, whereupon Schumacher said: " 'Fired, what do you mean? I don't know nothing about it,' " and Bartlett said: " 'I don't know nothing about it. Martin done it, that is the way it will be.' " Plaintiff then requested of the several defendants the holding of a corporate meeting, which, after several such requests, was held on January 6, 1949, in the corporate offices with all four stockholders present. Then and there plaintiff was told that the decision to discharge him would stand. Plaintiff then said: " 'Well, it looks like I am fired. Now I am fired I suppose I lose my stock.' " Whereupon Bartlett said: " 'No, you don't, no' * * * 'If ever any dividends paid you will get them. It might be five years before none ever paid.' * * * 'You know we ain't made any money. If hadn't been for me loaning this money and throwing this money in we would been closed long ago.' * * *

'Well, we might buy them from you.' * * * 'I don't think they are worth the $1000.00 you got in them because' * * * 'you know we have not made any money, haven't paid any dividends' * * * 'I might give you $800.00.' " Schumacher then said: " 'Well, I think we can give him his $1000.00 for them' " to which the other two defendants agreed, and, as suggested by Bartlett, they offered to add 5 percent interest for one year.

Believing and relying upon the representations heretofore recited, plaintiff agreed to accept such amount, delivered his stock to defendant Schumacher, and after an adjustment of his merchandise account, received a Bartlett and Company check by Schumacher, on January 7, 1949, in the sum of $949.99, as the net amount due him for his stock. In that connection, the record discloses competent evidence from which it could reasonably be concluded that while plaintiff was without knowledge of the financial status of the corporation, the other defendants not only had access to the corporate records and dealt with them in performance of their duties, but also were entirely conversant with the true situation.

In that connection, on September 30, 1948, Bartlett gave a corporate financial statement to Dun & Bradstreet, Inc., a national agency, to be used by its subscribers in making extensions of credit to the corporation. Such statement showed that Ace Plumbing & Heating Co., address 249 North 11th, then had assets of $59,600, with a surplus of $39,600 after deduction of liabilities, with sales of merchandise in the amount of 20 to 25 thousand dollars a month, and that the building account was owned by Bartlett and Schumacher to whom the corporation paid a rental of $150 a month.

Bookkeepers of the corporation, in their submission of balances after closing entries September 30, 1948, showed assets after depreciation in the amount of $55,213.08, with a profit of $3,898.54, a reserve account of $4,000, and a reserve for insurance of $3,000.

Auditors for the company prepared its 1947 income tax return, which showed a net taxable income of $14,777.78,. derived after taking full advantage of provisions for depreciation and obsolescence of merchandise predicated upon a valuation of the merchandise inventory, at cost or market, whichever was lower.

An audit was made by an accounting firm covering the corporate affairs from October 1, 1947, to January 6, 1949. It showed sales for that period amounting to $184,709.13, total assets of $59,384.54, and a net worth of $21,347.65, with a net profit of $17,143.30, before provision for income taxes, amounting to $3,795.65, leaving $13,347.65 as surplus and undivided profits upon the basis of $8,000 outstanding capital stock, $3,000 of which had been issued to Bartlett and Schumacher without plaintiff's knowledge or consent. Such computation took into consideration depreciation of trucks and equipment, valued the merchandise inventory at $20,625.27, its then cost or market, whichever was lower, with full provision for obsolescence and depreciation. It showed accounts receivable of $30,047.69, after a reserve for bad debts and deduction of a sales discount of $3,147.68 to the Bartlett and Schumacher partnership upon their own business projects, in spite of an agreement that discounts would be allowed to no one except to employees for work done on their own homes.

In the light of an analysis of the foregoing evidence, expert witnesses for plaintiff testified that the actual value of plaintiff's stock at the time of the sale was more than enough to sustain the verdict and judgment obtained by plaintiff. True, there was a conflict in the evidence upon material issues when the case was finally submitted, but those issues were for the jury. We conclude that the evidence was amply sufficient to sustain the verdict and judgment.

As heretofore stated, the measure of plaintiff's damages was the difference between the actual value of his stock at the time of sale, and the amount he received

for it. In that connection, defendants, without citing any authority, argued that the trial court erred in excluding evidence offered by them to show that the customary practice of retail plumbing and heating establishments in Lincoln was to inventory the merchandise of the business at cost or market, whichever was lower. As a matter of course, such business or bookkeeping usage, custom, or practice would not be conclusive upon the actual value of plaintiff's stock at the time of its sale. Plaintiff's own evidence, as well as other evidence adduced by defendants, had theretofore established that the corporation did so value its merchandise inventory. Therefore, the exclusion of such evidence could not have been prejudicial to defendants.

Defendants also argued that the trial court erred in refusing to permit defendant Martin to testify that it was a general custom or policy of the corporation to allow a 25 percent discount on all large projects for both plumbing and heating work. At the outset it appears that there was no foundation laid to show that plaintiff had any knowledge of such custom if existent. On the other hand, only one such discount was questioned by plaintiff, or shown by the corporation records and audit. That was the one allowed to Bartlett and Schumacher, which plaintiff testified was granted contrary to their agreement and done without his knowledge or consent. The proferred evidence was immaterial under the issues presented, and further, such evidence was contrary to the provisions of a stipulation appearing in the record which has been heretofore discussed. Defendants were bound by their own stipulation in any event.

Instruction No. 2 given by the trial court, about which defendants complained, correctly imposed the burden of proof upon plaintiff. In doing so, we conclude that it correctly stated the law applicable to the issues presented and supported by competent evidence. Defendants' contention that a misrepresentation is action-

able only if made with knowledge of its falsity or if the party uttering it could determine that it was false has no authority in this jurisdiction supporting it. The correctly applied rule is that a misrepresentation for the purpose of inducing reliance is fraudulent and actionable when damages result therefrom, if made with knowledge of its falsity or if made without knowledge as a positive statement of known fact. The representations here involved, if made, were either knowingly false or made without knowledge as positive statements of known fact, as distinguished from mere expressions of opinion. The foregoing discussion also attests the correctness of instruction No. 6 which in no manner conflicted with the rule stated in instruction No. 5, favorable to defendants.

Defendants also argued that in instruction No. 2 the jury should have also been cautioned that false representations made by one or two defendants would not be binding upon the other or others, in the absence of proof of a conspiracy among them, as generally requested by defendants in their proferred instruction No. 1. However, the court did, in instruction No. 4, actually impose the burden upon plaintiff to prove a conspiracy as therein defined by a preponderance of the evidence before he could recover, and we conclude that there was sufficient competent evidence to sustain such a finding.

Defendants argued that instruction No. 7 was palpably erroneous. It told the jury in effect that in fixing the value of the corporation's merchandise inventory for the purpose of determining the worth of its capital stock, it should consider the reasonable market value thereof, after which the instruction correctly defined such market value. Defendants argued that the value of such inventory should have been measured by their bookkeeping and accounting practices, that is, cost or market value, whichever was lower. There is no merit to that contention. In determining the value of the corporate inventory here involved, the proper inquiry would be

what it was then reasonably worth; in other words, its reasonable market value and not its cost or market value, whichever was lower, based upon customary bookkeeping or accounting practices. To have so limited the jury in a determination of its value would substitute a mere custom for a legal principle and benefit the alleged wrongdoers by depriving plaintiff of his right to be fully compensated for his actual loss. Cases heretofore cited sustain that conclusion.

Defendants argued that the trial court erred in refusing to give their requested instruction No. 4. An examination of the instruction discloses that such question has been previously disposed of adversely to defendants in our discussion of instruction No. 2 given by the court.

Defendants' requested instructions Nos. 5, 6, 7, 8, and 9 were not erroneously refused by the court because they simply had no application or relevancy to any issues pleaded, supported by evidence, and submitted by the court, or they erroneously stated applicable principles of law, or, in the light of all the instructions given, their refusal was not prejudicial to defendants. Further discussion would serve no purpose.

Upon consideration of all of the instructions given by the trial court, it appears that they fairly presented the issues to the jury.

Finding no error prejudicial to defendant, we conclude that the judgment should be and hereby is affirmed.

AFFIRMED.

MESSMORE, J., participating on briefs.